TRINA A. HIGGINS, United States Attorney (#7349)
TODD C. BOUTON, Assistant United States Attorney (#17800)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682
todd.bouton@usdoj.gov

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:22-cr-00424-CMR |
| Plaintiff, | UNITED STATES' POSITION WITH RESPECT TO SENTENCING FACTORS |
| vs. | |
| DEWAYNE LEE SMITH, | |
| Defendant. | Magistrate Judge Cecilia M. Romero |

*"There's a lot of money to be made [in health fraud] . . . People want to believe there's something that can cure them."*

—Bob Gatling, Then Director of Program Operations Staff for FDA's Center for Devices and Radiological Health (as of March 8, 2018).

### 1. INTRODUCTION

This is not your typical misdemeanor misbranding case. Nor does it merit a sentence of mere probation. Defendant Dewayne Lee Smith marketed and sold an unapproved and misbranded Bx Protocol "miracle drug" to persons with stage-4 cancer and other chronic illnesses for profit— without a reasonable basis to believe the drug would actually help them. From just January 2017 to April 2018, by selling this product, Smith and his wife raked in over $1.5 million in revenues. At least $657,531 (42%) of those revenues went to them in salary, while people died. Defendant made this money and more (in $16,995 to $28,000 increments) by feeding his patients/customers

false hopes during some of their most desperate hours as they grasped for one last miracle cure. FCC testing suggested there was nothing in his product other than water, bacteria, and mold.

After hiring highly competent defense counsel, Smith ultimately accepted responsibility for his crimes and agreed to a plea deal pursuant to Fed. R. Crim. P. 11(c)(1)(C). Pursuant to his plea agreement, on December 8, 2022, Smith pleaded guilty to 3 Counts of Introduction of Misbranded Drugs Into Interstate Commerce in violation of 21 U.S.C. § 331(a). More specifically, Smith admitted that he (1) introduced misbranded drugs into interstate commerce (21 U.S.C. § 331(a)); (2) introduced an unapproved new drug into interstate commerce (21 U.S.C. § 331(d)); and (3) did so while failing to register or list as a drug manufacturer with the FDA. But Smith's counsel maintain that Smith believed his Bx Protocol could help some chronically ill persons and that he was acting in "good faith" when he peddled his Bx Protocol product.

Accordingly, the United States recommends a sentence of 3 months of imprisonment, a $9,500 fine, and 1 year of supervised release, with special conditions to ensure that Smith not continue to market any drugs or dietary supplements without prior approval from his probation officer. Under supervision, Smith should not be permitted to market or sell any more misbranded drugs. If, however, the Court grants defense counsel's expected request to impose probation only—with no prison time whatsoever—the United States recommends that Smith receive the maximum, three-year term of probation, with an initial three months of home confinement, and appropriate conditions to protect the public from any further misbranded drugs.

/ / /

/ / /

/ / /

2

## 2.  FACTUAL BACKGROUND

### 2.1  Smith Marketed an Unapproved and Misbranded Drug Called "Bx Protocol" to Persons with Cancer and Other Chronic Illnesses.

Starting around 2011, Dewayne Smith, founded several companies to market an alternative medical treatment called "Bx Protocol" to cancer patients and other chronically sick individuals. (PSR ¶ 8). These companies included a company Smith founded in Belize in 2011 called Delta Institute International Limited ("Delta"), through which he marketed the "Bx Protocol." (*Id.*). They included another Utah LLC Smith founded in June 2011 called Delta Member Services, Inc. ("DMS"), through which he earned money from his "Bx Protocol," and paid his companies' employees, advertising costs, and operational costs. (*Id.*). They also included another Utah LLC Smith founded in March 2017 called Somerset Falls, LLC which he created to process investment money for a facility in Jamaica that was intended to take his Bx Protocol to the world. (*Id.*).

To promote his "Bx Protocol," Smith set himself up as the CEO and "Chief Scientist" of his marketing company, Delta. (PSR ¶ 9). Smith also employed alternative medical professionals, a Chief Operations Officer from Switzerland, a number of sales affiliates (or "BXU Advocates"), and a multimedia director. (*Id.*). With this team, Smith created online video infomercials to help market Bx Protocol. (*Id.*). Smith normally charged his customers $16,995 or more for a two-year membership that entailed a supply of "Bx Protocol" product and promised consultations for the treatment protocol and access to a Naturopathic doctor. (*Id.*). He also ran DMS and Somerset Falls LLC out of Utah to help him sell and administer the Bx Protocol. (*Id.*).

From merely January 2017 to April 2018, Smith's two companies selling the "Bx Protocol" treatment had an estimated $1,575,874 in revenues. (PSR ¶ 10). In that same 16-month timeframe,

defendant Smith and his wife earned at least $657,531 (42%) of those gross revenues. (*Id.*). Smith's salary was $240,000 per year; and his wife earned $48,000 for being the comptroller. (*Id.*).

In communicating with customers in person, on the phone, and online, Smith used the title "Dr. Smith" to lend himself an air of credibility. (*See* PSR ⁋ 11). This title was presumably based on his Ph.D. in "biological sciences" from what appears to be an online diploma mill called Canterbury University, based somewhere in the Somali Sea. (*See id.* ⁋ 84).[1]

## 2.2 Smith Made Online Videos to Suggest His "Bx Protocol" Could Help Treat Cancer and Other Chronic Illnesses.

Smith also marketed his "Bx Protocol" with online videos crafted for his target audience. (*See* PSR ⁋ 11). One of Smith's video informercials shared testimonials of persons who were purportedly recovering from or had treated cancer and other diseases by using the "Bx Protocol" and showed pictures of purported tumor reductions. (Bx Protocol Cancer Reviews and Testimonials_A Medical Breakthrough.wmv" (the "Bx Cancer Video"). This video also included commentary from alternative medical professionals like Valerie Donaldson, M.D.—the Founder and Medical Director of the Regenerative Medicine Center (RMC) in Aspinwall, PA. (PSR ⁋ 12). This video also included statements from Beth McDougal, M.D. who describes herself as a "medical detective" who offers her Mill Valley, CA patients "the best of Western Medicine in

---

[1] Canterbury University appears to be an unaccredited, private, online, degree-granting institution and diploma mill based in the Republic of the Seychelles which is reportedly associated with "instantdegrees.com." George Brown, *Fighting Credential Fraud: A Brief Critique of Australian and American Approaches to Qualification Verification and Authentication*, World Education News & Reviews, Volume 18, Issue 5, October 2005 at https://wenr.wes.org/2005/10/wenr-oct-2005-fighting-credential-fraud (last visited February 13, 2023).

The Republic of Seychelles is an island nation located in the Somali Sea segment of the Indian Ocean, northeast of Madagascar, and about 1,600 km (994 mi) east of Kenya.

conjunction with Naturopathic, Functional, European Biological, and Ayurvedic Medicine, as well as the latest advances from Unified Field Physics." (*Id.*; Clear Center of Health, Beth McDougall, MD, Medical Director, at http://clearcenterofhealth.com/beth-mcdougall-md (last visited February 13, 2023)). Some videos also included commentary from Sharon Tenpenny, D.O., a naturopathic doctor who once claimed that COVID-19 vaccines made people magnetic. (*See* PSR ⸗ 12; *Cleveland Doctor who claimed Covid vaccine caused magnetism under medical board investigation*, at https://www.cleveland19.com/2022/10/30/cleveland-doctor-who-claimed-covid-vaccine-caused-magnetism-under-medical-board-investigation/) (last visited February 13, 2023)).

The same video also contained statements from one "Todd DuMaurier, NMD." (PSR ⸗ 13). However, "DuMaurier" was not educated or licensed in the United States as a Naturopathic MD. (*Id.*). Instead, it was discovered through investigation that he had no medical degree recognized in the state of Utah—although he claimed to have a degree in natural medicine from Calcutta, India. (*Id.*). "DuMaurier" was also found to be an Uber driver pursuing a bachelor's degree at Utah Valley University. (*Id.*). His real name was found not to be "DuMaurier," but actually a less exotic "Todd David Mauer." (*Id.*). To explain why he used the name "DuMaurier," Mauer stated that Smith told him to change his name for "security reasons" because Mauer reportedly felt unsafe after he received some online threats. (*See id.*). Notably, Mauer told investigators that "he only read *the script* provided by [Smith] for the video because *he needed money*." (*Id.*) (emphasis added). Mauer was not certain if the statements made in the video were accurate. (*Id.*). However, Mauer confirmed that he did suffer from Lyme disease, as he discussed in the video, and that he believed the Bx Protocol improved his condition. (*See id.*).

/ / /

5

### 2.3    Smith Used a Testimonial by R.Z. and Statements by a Researcher to Suggest His "Bx Protocol" Could Help Treat Cancer and Other Chronic Illnesses.

Smith's online Bx Protocol video informercial called "Bx Protocol Cancer Reviews and Testimonials_A Medical Breakthrough.wmv" (the "Bx Cancer Video") was, at least, superficially persuasive. At least one patient/customer to whom Smith sent his "Bx Protocol" product watched and relied on this Cancer Video in deciding to purchase a membership in the Bx protocol.[2]

### R.Z.'s Testimonial (Still Used After His Death)

This video portrayed a man named R.Z. who had stage 4 lung cancer. (Bx Cancer Video). In the video, R.Z. discussed how his doctors had diagnosed him as beyond treatment. (*Id.*). His "old pulmonologist" reportedly told him he had never seen anyone beat R.Z.'s disease and that "it could be lights out [for him] any minute." (*Id.*). R.Z. was recommended to hospice. (*Id.*). In the video, he claimed that after taking the Bx product, however, he felt better and within a year, had even started training for a half-marathon. (*Id.*). The video showed him running. (*Id.*). He stated that every day, he supposedly ran an extra mile as a victory. (*Id.*). The video suggests the Bx Protocol can extend someone's life and help them recover from stage 4 lung cancer. (*See id.*).

But, in reality, R.Z.'s condition did not improve. (December 18, 2019 Memorandum of Interview of R.Z.'s Wife, M.Z. at p. 1). Instead, according to his now widow, his condition steadily declined. (*Id.*). He lost a lot of weight and could hardly walk. (*Id.* at p. 2). His wife, M.Z., reportedly confronted Smith and told him that his Bx Protocol "was a scam." (*Id.* at p. 1). Smith refunded her $10,000 of the $26,000 that she and her husband had paid for R.Z.'s membership.

---

[2]  M.D., who had breast cancer, watched the video with her husband. They found it very persuasive and relied on it in deciding to purchase the Bx Protocol membership. It led them to believe that Bx could help M.D. overcome her cancer. Though M.D. bought the product, she died of cancer. (*See infra* § 2.8B).

(*Id.* at pp. 1-2). But in March 2016, R.Z. died from his cancer. (Death Certificate of R.Z.) (reflecting March 3, 2016 date of death and "Metastatic Lung Cancer" as his cause of death).

Five years later, in April 2021, Smith was still using the same video footage of R.Z. to promote the Bx Protocol—only he had now rebranded Bx as "Mitolytix" and was purportedly selling it  outside the United States. (Mitolytix Reviews.mp4 [downloaded April 1, 2021]; Mitolytix Webinar Replay – Healing Cancer at the Root Cause Mitochondria Restoration Breakthrough mp4 [downloaded April 1, 2021).[3] The video footage continued to create the false impression that R.Z. was still improving from taking the protocol, and that he was still alive and well, and training for half-marathons—as opposed to having died from cancer five years before.[4]

### Statements from Smith

In the same Bx Cancer Video, Smith claimed his revolutionary Bx Protocol was a new paradigm in medicine focused on health restoration, and that it was a "medical breakthrough" for treating cancer and other conditions. (Bx Cancer Video; PSR ¶ 14). He claimed (through McDougal) that cancer is a metabolic disease resulting from altered mitochondrial functioning but that (in his own words) the Bx Protocol somehow "helps oxygen be consumed at a mitochondrial level" and "improves cellular performance within the general cellular landscape," thus restoring the oxidative mechanism of the cell. (PSR ¶ 14). Smith further claimed that "The Bx Protocol [was] showing unprecedented results in about 41 different areas." (Bx Cancer Video; PSR ¶ 15). This statement is consistent with claims that Smith made in personal calls and online communications to persons exploring the Bx Protocol. (*See* PSR ¶ 15).

---

[3] Smith apparently shut down the Bx Protocol business around 2020 after the FDA began investigating him and his companies, only to rebrand his "Bx" product as "Mitolytix" and move his business outside the FDA's jurisdiction.

[4] When M.D. watched the video in September 2018, she was not advised that R.Z. had been dead for over two years.

7

**Statements from Researcher (Later Clarified)**

The cancer video also contained a segment with Utah State University researcher, Patti Champine. (PSR ₱ 16). P.C. has a Master of Science in Medicinal Chemistry from the University of Utah. (*Id.*). In the video, Ms. Champine noted that her research showed, "non-small cell carcinoma cell lines were profoundly affected by Bx within 90 days." (*Id.*). She is quoted as saying that there was a diminishment of growth capacity and the number of cancer cells remaining when they were treated with Bx. (*Id.*). This is consistent with her written report summarizing the results of her study, where she wrote that it is "evident that cellular reproduction is significantly slowed in response to the BX catalyst treatment compared to sterile water (Mock) treatment or untreated cultures grown in parallel, since there is no evident overwhelming increase in cellular death, yet the cultures hold lower volumes of cells as evidenced by reduced 3 dimensional growth in BX treated flasks and wells at later times points." (*Id.*). In the video Ms. Champine is shown saying, "I just see so much potential for this because it is so different from any other toxic agent or anything else I've tried to treat cancer cells with." (*Id.*).

An interview with Ms. Champine after she was shown the video, however, shed some light on her comments. (*See* PSR ₱ 17). Ms. Champine explained that Smith hired the lab she worked at, and paid $30,507, to have the lab conduct an analysis of the Bx Protocol drug to see if it would stop or kill breast, lung, colon, or skin cancers. (*Id.*). She reaffirmed the results of her testing, but she explained that she used a cell culture, which is an artificial and controlled system that is created for testing. (*Id.*). She further explained that her lab was not hired to take the necessary next steps for determining efficacy in humans by completing a protein and DNA analysis, then a small animal study, then a big animal study, and then lastly human studies. (*Id.*). She also explained that it is

8

hard to replicate the human body and how a drug passes through tissue and organs during a cell culture, like the one she performed. (*Id.*).

*Ms. Champine further explained that her comments were not meant as an endorsement of the Bx product. (PSR ¶ 18). She stated that she is not a medical doctor and understood there was no research to support the conclusion that the "Bx Protocol" could help treat cancer in humans.* (*Id.*). Rather, she said her statements were only meant to recognize that in a controlled environment, a reduced growth rate was experienced on the cells treated with Bx. (*Id.*). She believed that this potential outcome was enough for Smith's company Delta to consider pursuing additional research and studies. (*Id.*). *But she explained that she did not mean to suggest that her research showed Bx could help cure cancer in humans.* (*Id.*).   However, she admittedly stated that "she was excited by the results the study produced. . . ." (*Id.*).

Ms. Champine further explained that Mr. Smith was very persistent in trying to get her to acknowledge and agree that the Bx Protocol would work on people. (PSR ¶ 19). But she refused to agree with his opinion because there was not enough research completed to support that conclusion. (*Id.*). *She told Smith her study **did not** provide the support needed to begin using the Bx product on humans*, but was just a step in the direction of getting to clinical trials after testing on small and large animals. (*Id.*). Based on her conversation with Smith, *it was clear to her that Smith understood the process of getting Bx Protocol approved for use on humans and the need to conduct further studies before using it on humans.* (*Id.*).

/ / /

/ / /

/ / /

### 2.4 It Remains Unclear What, If Anything, Other Than Water (and Perhaps "Energized Fructose") Was in the Bx Product.

Smith's formula for the Bx protocol was a closely guarded secret.

The FCC tested some bottles and vials of the Bx product to determine what it contained and could identify *no active pharmaceutical ingredients*—finding only bacteria, and mold. (PSR ⁋ 20).[5] Smith challenges the FCC's test results, however, and contends the test was unreliable because the FCC failed to identify the active ingredients included in its testing protocol. (*See id.*).

But Tristin Wallace, who identified as a "Naturopathic Physician and Applied Kinesiologist," and was Smith's Medical Director, had some idea what Smith may have put in his Bx product. (PSR ⁋ 23). From observations and discussions with Smith, Wallace surmised that the Bx product contained: (1) water, (2) fructose, and (3) ethylenedione—a "transient molecule" purportedly bearing a charge from a fructose molecule. (*Id.*).

### 2.5 Witnesses Testified That Smith Often Personally Manufactured the Bx Protocol In His Barn or In His Office.

Witnesses testified that Smith often personally manufactured the Bx Protocol in his barn. (PSR ⁋ 21). These witnesses indicated that Smith purchased jugs of deionized water and then mixed the Bx in a "clean room" in his barn. (*Id.*). This room was constructed of PVC pipe and plastic. (*Id.*). The Bx product was kept there in a refrigerator. (*Id.*). Smith would then have employees come pick up containers of the product with handwritten labels on them identifying which Bx formulas they contained. (*Id.*).

/ / /

---

[5] Based on testimony from witnesses and general observation, the Bx Product also included water.

At other times, the defendant would prepare the Bx in his office at the treatment center. (PSR ¶ 22). He would come out of a room with the base formula and instruct employees to add certain amounts of deionized water to create one of several specific Bx formulas. (*Id.*). For some reason, he told an employee to shake the product 100 times each time she handled it. (*Id.*).

This was not an approved drug or medicinal product produced in a standard clean room.

## 2.6 Roughly 1/3 of Smith's Patients/Customers Died of Their Illnesses While Taking the Bx Protocol, But Some Reported Positive Results.

Smith's Digital Marketing Manager provided a list of "Bx Protocol" members' "status" that contained some sobering statistics. (PSR ¶ 24). This list showed that about 12% (67/550) "Bx Protocol" members had quit or cancelled the program, and another 32% (179/550) of them had died while using the Bx Protocol. (*Id.*).

However, the government also identified customers who had positive experiences with the Bx Protocol and Smith. (PSR ¶ 24). For example, a customer who suffered from Lyme disease (A.H.) informed the government that "her symptoms showed significant improvement" after she started taking BX. (*Id.*). A.H. "stated that nothing else had worked and the BX started her path to recovery." (*Id.*). Another customer who had fibromyalgia (D.P.) reported that "after using the product she experienced less nerve pain in general and had decreased symptoms of fibromyalgia." (*Id.*). D.P. stated that "the BX Protocol program did work for her," and "she [was] very ecstatic about the results." (*Id.*). The government also interviewed a customer (J.J.) who had been diagnosed with Multiple Sclerosis and stage 4 cancer and had a positive experience with Smith and the BX protocol. (*Id.*). J.J. informed the government that Smith "never promised that BX would cure his cancer" and "never discouraged him from continuing to seek conventional

11

treatment." (*Id.*). He stated that "he is aware that Dr. Smith is not a medical doctor and he (Johnson) does not think that BX is a scam." (*Id.*). J.J. stated that "about two months after starting the BX protocol," "his MS symptoms went away." (*Id.*). In addition, although he could not state for certain whether the BX protocol was responsible for the successful treatment of his cancer, "his oncologist is amazed at how long Johnson has lived past the original estimate of 3 months to one year." (*Id.*). The government's interview of J.J. was conducted on October 9, 2019; he was originally diagnosed with stage 4 cancer in late 2015/early 2016. (*Id.*).

**2.7  Without Making Any Guarantees, Smith Generally Charged His Patients/Customers $17,000 to $28,000 for the Bx Protocol.**

Smith appeared to be careful not to guarantee results to his patients/customers. But Smith's Bx Protocol did not come cheap. Smith charged customers anywhere from $10,000 to $28,000 each for a two-year membership in his Bx Protocol treatment program. (PSR ⁋ 25). In fact, the average charge was usually around $17,000 to $20,000. (*Id.*).

**2.8  Smith Sold His Bx Product to Persons In Other States.**

Although based in Utah, Smith sold his Bx Protocol product to persons in other states.

**2.8A  Count 1: May 22, 2018 – Sold to L.B. in Nevada**

L.B. was a kindergarten teacher in Las Vegas. (PSR ⁋ 26). In 2007, L.B. was diagnosed with a rare form of breast cancer. (*Id.*). She was not a supporter of traditional medicine, but initially decided to seek traditional treatments for her cancer. (*Id.*). She received eight rounds of chemotherapy, six rounds of radiation, a double mastectomy, hormone therapy, and a hysterectomy. (*Id.*). After receiving this treatment, she was frustrated she still had cancer. (*Id.*). A friend suggested she should consider a product offered by the defendant. L.B. contacted the Delta

company to get more information. (*Id.*). After she spoke to the defendant, L.B. told her husband, that the treatment was very expensive, and the total membership had to be paid up front. (*Id.*).

L.B. told her coworkers and members of her church (an LDS congregation) that she wanted to try Bx Protocol to see if it would help treat her cancer. (PSR ¶ 27). L.B.'s coworkers and members of her church helped L.B. raise the funds to pay a $11,500 reduced membership fee so that L.B. could try to beat her cancer with the Bx Protocol. (*Id.*). On May 22, 2018, L.B. paid for a membership with a check for $11,500. (*Id.*).

Sometime in 2018, L.B. and her husband drove from Las Vegas, Nevada to Salt Lake City, Utah to meet with the defendant. (PSR ¶ 28). The defendant was unavailable, so they met with Todd Mauer. (*Id.*). Mr. Mauer gave them a presentation suggesting that Bx could help treat L.B.'s cancer. (*Id.*). However, Mr. Mauer did not provide any percentages of effectiveness or provide any guarantees. (*Id.*). L.B. came home with a box of Bx Protocol. L.B. began the Bx Protocol. (*Id.*). She informed the government that she began the treatment with a visible tumor on her right shoulder and after a period of approximately 6-8 weeks, the tumor began to experience necrosis. (*Id.*). She explained that this was proof to her that the Bx was effective. (*See id.*).[6]

To renew her membership in 2019, L.B. again enlisted her coworkers and fellow church members to raise the $4,995 membership renewal fee. (PSR ¶ 29). They successfully raised the renewal fee. (*Id.*). And on May 19, 2019, L.B. sent the defendant another check for $4,995 to renew her membership. (*Id.*).

By August 2019, a blood test and PT scan showed that L.B.'s cancer had progressed. (PSR ¶ 30). L.B. learned that Smith had suspended operations and stopped treating members. (*Id.*). She

---

[6] Notably, in some of his videos, Smith had suggested that necrosis was a sign that the Bx Protocol was working. (*See* Bx Cancer Video).

recalled Smith posting a message related to this decision on his website. (*Id.*). When the defendant ignored L.B.'s requests for treatment advice, L.B. quit using Bx Protocol. (*Id.*). By October 2019, L.B. had stage 4 metastatic breast cancer that had progressed to her lungs. (*Id.*). On May 11, 2020, L.B. died from her cancer at the age of 54 years old. (*Id.*).

### 2.8B    Count 2: September 18, 2018 – Sold to M.D. in Illinois

M.D. lived Oak Forest, Illinois and developed stage 4 breast cancer. (PSR ⁋ 31). Her husband, tried to find treatment for her. (*Id.*). In 2018, he located the Delta company, and they requested information. (*Id.*). In researching the Bx Protocol, M.D. and her husband watched the Bx cancer video containing an older gentleman (identified as R.Z.) running after taking the Bx Protocol. (*Id.*). The video was very convincing and played a significant part in their decision to purchase the Bx Protocol program. (*Id.*). They said they "wanted to believe it was true." (*Id.*).

In reliance on the representations in the Bx cancer video and other representations about the Bx Protocol, in September 2018, M.D. paid at least $10,000 to purchase a Bx Protocol membership from Delta. (PSR ⁋ 32). M.D. followed the Bx Protocol and did not recover. (*Id.* ⁋ 33). Before she died, M.D. and her husband were upset the defendant stopped communicating or providing treatment to M.D. (*Id.*). They requested a refund—and were ultimately refunded at least $7,625.71. (*Id.*).

On June 2, 2021, M.D. died from her cancer. (PSR ⁋ 34). She was 55 years old. (*Id.*).

### 2.8C    Count 3: October 27, 1028 – Sold to S.B. in Washington

S.B. lives in Washington State and suffers from squamous cell carcinoma, HPV-16 positive, throat cancer. (PSR ⁋ 35). S.B. found Delta International online while looking for anyone who had successfully treated his type of cancer. (*Id.* ⁋ 36). Around October 2018, he spoke to the

defendant and told the defendant that "this [was] [his] last financial shot to save [his] life." (*Id.*). S.B. specifically asked Smith if Delta International had successfully treated anyone suffering from squamous cell carcinoma HPV-16 positive throat cancer. (*Id.*). Smith said, "yes," and said Delta had successfully treated people who had that specific type of cancer. (*Id.*). When S.B. asked to be put in contact with those patients, Smith told him that privacy regulations prevented him from doing so. (*Id.*). S.B.'s conversation with the defendant gave him the impression that Bx Protocol could help treat his cancer; however, the defendant told him there was no guarantee. (*Id.*).

In reliance on Smith's representations that Delta International had successfully treated others with S.B.'s rare form of cancer and that the Bx Protocol could help his condition, S.B. purchased a membership in the Bx Protocol. (PSR ¶ 37). On October 27, 2018, S.B. wired $19,995 to Delta to pay for the membership. (*Id.*). He then started the Bx Protocol. (*Id.*).

S.B. used the products over time, however, his cancer did not respond to the Bx Protocol treatment as he had hoped and expected. (PSR ¶ 38). The treatments were not successful. (*Id.*). S.B. still has cancer and he is approximately 70 years old. (*Id.*).

### 2.8D   Other Persons Who Purchased the Bx Product Without Favorable Results.

Some others also purchased the Bx Protocol treatment with questionable results. S.M. purchased the Bx Protocol treatment for medical conditions related to her daughter's Lyme disease. (*See* PSR ¶ 39). She paid $16,975 for the product. (*Id.*). She later paid another $5,995 for her daughter to have a week-long treatment at Delta's Summerset Falls location in South Jordan, Utah. (Memorandum of October 7, 2019 Interview of S.M. ("S.M. Interview") at p. 2). But after traveling with her daughter from Canada to Smith's treatment center in South Jordan, and staying

there just three days, she concluded that the Bx Protocol was a fraud and confronted "DuMauier." (*Id.*). When she asked for a refund, "DuMauier" told he that he didn't have the authority to grant her a refund and the money might not be available because Smith used it to buy products and machines. (*Id.*). During her interview with an FDA agent, S.M. Smith referred to herself and her ill daughter, expressing that Smith and Delta "stole their time, money, and hope." (*Id.* at p. 3).

A.S. also purchased the Bx Protocol for "extension in life." (PSR ⁋ 39). A.S. paid at least $3,020 for the product after Smith told her that for healthy people, "it would reverse seven years of [their] life." (*Id.*; Memorandum of September 19, 2019 Interview of A.S ("A.S. Interview") at p. 1). A.S. even became a "coach" whereby she participated in information calls with Smith and potential patients/customers. (*See* PSR ⁋ 39). She received a $3,000 commission for referring someone else to become a member. (*Id.*). One of her referrals, M.W., was battling uterine cancer. (A.S. Interview at p. 1). M.W. paid purchased a Bx Protocol membership for $25,000 and then died about 1.5 months later. (*Id.*). A.S. also took the Bx supplement herself for a few months, but she eventually quit taking it, stating, "I think it's just water in a bottle." (*Id.*; PSR ⁋ 39).

### 2.9    In Distributing His Bx Protocol, Smith Violated the FDCA.

In distributing his Bx Protocol, Smith violated the Food, Drug, and Cosmetic Act ("FDCA") in at least three ways: (1) by introducing misbranded drugs into interstate commerce (21 U.S.C. § 331(a)); (2) by introducing an unapproved new drug into interstate commerce (21 U.S.C. § 331(d)); and (3) by being a drug manufacturer that failed to register or list with the FDA.

The Bx Product qualified as a drug because it was "an article intended for use in the cure, mitigation, treatment, or prevention of disease in [hu]man[s]." 21 U.S.C. § 321(g)(1). Smith

/ / /

claimed Bx could treat cancer, Lyme disease, and a variety of other ailments. (PSR ¶ 41). He introduced Bx into interstate commerce without FDA approval. (*Id.*).

Smith also misbranded the Bx-"drug" by failing to include the name and place of business of the manufacturer, packer, or distributer (21 U.S.C. § 342(b)) and providing inadequate instructions for use by a layperson (21 U.S.C. § 352(f)(1)). (PSR ¶ 42).

Smith also failed to register his manufacturing facility with the FDA and failed to list his Bx-drug with the FDA. (PSR ¶ 43). He never received an FDA Establishment Identifier ("FEI") Number (for his manufacturing facility/barn). (*Id.*). Nor did he ever receive a National Drug Code ("NDC") for the Bx-drug. (*Id.*).

## 2.10 Smith Ultimately Accepted Responsibility and Agreed to a Fed. R. Crim. P. 11(c)(1)(C) Agreement to Plead Guilty to Three Counts of Misdemeanor Misbranding in Violation of 21 U.S.C. § 331(a).

Without forcing the case to trial, Smith ultimately accepted responsibility for his crimes and signed a Fed. R. Crim. P. 11(c)(1)(C) Plea Agreement. (ECF No. 9). On December 8, 2022, consistent with his Plea Agreement, Smith pleaded guilty to three counts of Misdemeanor Introduction of Misbranded Drugs Into Interstate Commerce in violation of 21 U.S.C. § 331(a). (ECF No. 9 at ¶¶ 1 and 12.a.). Smith also agreed to serve a sentence of 0-3 months' imprisonment and to pay a fine of $500 to $9,500. (ECF No. 9 at ¶¶ 1, 11-12, 12.a., 12.b., and 12.g.).

In his Plea Agreement, Smith specifically confessed that:

> From about 2011, and continuing until around June 2019, in the
> District of Utah and elsewhere, I introduced, delivered for introduction, and
> caused the introduction and delivery for introduction into interstate

17

commerce, drugs, as defined as Title 21, Unites States Code, Section ]321(g), to wit: Bx Protocol. I facilitated this introduction through my companies, The Delta Institute; Delta Member Services, Inc.; and Somerset Falls, LLC.

For example, on or about the dates listed below, I shipped and caused to be shipped via the US Postal Service to the following individuals, Bx Protocol, a drug which was misbranded in that (1) The labeling was false and misleading, in that it was represented to be a dietary supplement (21 U.S.C. § 352(a)); (2) It was manufactured, prepared, propagated, compounded, and processed in an establishment not duly registered as a drug manufacturer with the United States Food and Drug Administration (21 U.S.C. § 352(o)); (3) The labeling failed to bear adequate directions for use (21 U.S.C. § 352(f)(1)); and (4) It did not bear a label containing the name and place of business of the manufacturer, packer, or distributor, including the street address, city and zip code (21 U.S.C. § 352(b)):

- Count 1:   May 22, 2018 – to L.B. in Nevada;

- Count 2:   September 18, 2018 – to M.D. in Illinois; and

- Count 3:   October 27, 2018 – to S.B. in Washington.

I admit that Bx Protocol was intended for use in the diagnosis, cure, mitigation, or treatment of disease in man, and therefore is a drug and not a dietary supplement.

/ / /

(ECF No. 9 at ₱ 11). By this admission, Smith accepted responsibility for all three counts of Introduction of Misbranded Drugs Into Interstate Commerce charged against him.

### 3.  GUIDELINE CALCULATION BY THE UNITED STATES

The United States calculates the defendant's sentencing guidelines as follows:

***Counts 1-3:    21 U.S.C. § 331(a) (Introduction of Misbranded Drugs into Interstate Commerce)***

| | | |
|---|---|---|
| § 2N2.1(a) | Base Offense Level | + 6 |
| § 3E1.1(a) | Acceptance of Responsibility | - 2 |
| Total Offense Level w/ Acceptance of Responsibility | | = 4 |

Criminal History Category I (0 Points)

**Total Offense Level (4) + Criminal History Category I   = 0-6 Months**

### 4.  THE RECOMMENDED SENTENCE IS REASONABLE

As noted above, the United States recommends the Court impose on Smith a sentence of 3 months of imprisonment, a fine of $9,500, and 1 year of supervised release, with special conditions to ensure that Smith not continue to market any drugs or dietary supplements without prior approval from his probation officer. Alternatively, if the Court chooses to reject this recommendation and to impose a sentence of probation only, the United States recommends that Smith then receive the maximum, three-year term of probation, with an initial three months of home confinement, and appropriate conditions to protect the public from any further misbranded drugs. The recommended sentence is reasonable and supported by the Section 3553(a) factors.

Section 3553(a) provides that "[t]he court shall impose a sentence *sufficient, but not greater than necessary*, to comply with the purposes set forth in paragraph [(a)](2). . . ." 18 U.S.C. § 3553(a) (emphasis added). These purposes include the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §§ 3553(a)(2)(A)-(D).

In evaluating a recommended sentence, the court should consider these overriding purposes in weighing all the factors to be considered under Section 3553(a). These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) [the aforementioned overriding purposes]; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. §§ 3553(a)(1)-(7).

Carefully considered, these factors support the recommended sentence of 3 months of imprisonment, a $9,500 fine, and 1 year of supervised release, with appropriate conditions. At a minimum, they support three years of probation, with three months of home confinement.

## 4.1 The Nature and Circumstances of the Offenses and the History and Characteristics of the Defendant Justify the Recommend Sentence.

The nature and circumstances of Smith's offenses and Smith's history and characteristics justify the recommended sentence of 3 months' imprisonment, a $9,500 fine, and 1 year of supervised release. 18 U.S.C. § 3553(a)(1). Smith is 57 years old. (PSR at 2). He obtained a degree in General Studies form the University of Nevada – Las Vegas and a bachelor's degree in

Occupation Sciences from the University of North Dakota. (*Id.* ¶ 84). He also obtained an online Ph.D. in biological sciences from Canterbury University. (*Id.*; *see supra* n. 1).

Smith has virtually ***no prior criminal history*** (PSR ¶¶ 62-70). Therefore, he falls under Category I—the lowest level of criminal history. (*Id.* ¶¶ 67-68; USSG Ch. 5 Pt. A).

However, from 2011 to 2019, his primary employment involved marketing the Bx Protocol to chronically ill patients, while he earned $200,000 to $300,000 per year. (PSR ¶ 86). Since then, Smith is reportedly consulting occasionally and working on a new business endeavor called "Life Engine," and working on medical case management software and harvesting "nano particles." (*Id.*). Smith's prior and current employment suggest he should be supervised in selling products to the public—especially any product that is health related. (*See supra* §§ 2.1-2.10).

For approximately eight years, Smith marketed his Bx Protocol to cancer patients and other desperately ill persons for $17,000 to $28,000 per two-year membership. (PSR ¶¶ 25, 86). While patients died, he took their hard-earned money, paying himself $200,000 to $300,000 per year, and his wife another $48,000 per year. (*Id.* ¶¶ 10, 24, 86). He lived well off the earnings of the dying. And he did it without a reasonable basis to believe his Bx Protocol product would actually help them. Smith only stopped peddling his Bx Protocol after the FDA began investigating him.

A federal misdemeanor conviction for introducing misbranded drugs into interstate commerce can support a sentence of up to 1 year in prison. 21 U.S.C. § 333(a)(1) and 18 U.S.C. § 3559(a)(6). Based on the misdemeanor offenses charged and pleaded to, here, the guideline calculation for Smith's sentence is 0-6 months. (*Supra* § 3). The guideline range is not 0-0 months—or guaranteed probation. (USSG Ch. 5 Pt. A). Nor should it be. A range of 0-6 months

/ / /

means just that—up to 6 months in prison. Therefore, a sentence of 3 months' imprisonment would fall right in the middle of the guideline range and would be reasonable under the circumstances.

### 4.2.    The Recommended Sentence Would Further the Purposes of § 3553(a).

The purposes of sentencing under Section 3553(a) also support the recommended sentence. 18 U.S.C. §§ 3553(a)(2)(A)-(D). A sentence of 3 months' imprisonment, a $9,500 fine, and 1 year of supervised release is sufficiently severe and lengthy. It would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for Smith's offense, without punishing him more than necessary. 18 U.S.C. § 3553(a)(2)(A).

Although misdemeanors, Smith's offenses of introducing an unapproved and misbranded drug into interstate commerce are serious. 18 U.S.C. § 3553(a)(2)(A). Although the Bx Protocol was not shown to physically harm any of Smith's customers, they were all harmed financially. Further, Smith undermined the federal regulatory system put in place to ensure that drugs sold to the public are appropriately vetted and regulated to protect the public from injury—both physical and financial. Indeed, an FDA representative could not have said it better when he stated:

> *"There's a lot of money to be made,"* says Bob Gatling, director of the program operations staff in the Food and Drug Administration's Center for Devices and Radiological Health. "*People want to believe there's something that can cure them."*
> . . .
>
> FDA describes health fraud as "*articles of unproven effectiveness that are promoted to improve health*, wellbeing or appearance." The articles can be drugs, devices, foods, or cosmetics for human or animal use.

*U.S. Food & Drug Administration, How to Spot Health Fraud*, at https://www.fda.gov/drugs/bioterrorism-and-drug-preparedness/how-spot-health-fraud#:~:text=FDA%20describes%20health%20fraud%20as,for%20human%20or%20animal%20use (last visited February 14, 2023) (emphasis added).

Sentencing Smith to 3 months' imprisonment would promote respect for the law and deter other criminal conduct. 18 U.S.C. §§ 3553(a)(2)(A) and (B). The sentence would send the appropriate message to any other persons who—whether merely for personal gain or for less sinister, but still misguided, altruistic purposes—would otherwise be tempted to ignore FDA regulations and introduce unapproved or misbranded drugs into interstate commerce. Sentencing Smith appropriately would show the public that such persons who sought to introduce unapproved or misbranded drugs without first obtaining regulatory approval and demonstrating their product's safety and effectiveness before unleashing it on the public and their wallets will face consequences.

The recommend sentence would provide just punishment for Smith without being excessive. 18 U.S.C. § 3553(a)(2)(A). Smith engaged in approximately eight years of related misconduct involving introducing an unapproved and misbranded drug into interstate commerce. He took advantage of desperately ill persons by selling them a drug of "unproven effectiveness" because he knew they "want[ed] to believe there [was] something that [could] cure them." *See supra*, *How to Spot Health Fraud*. He should do some time. Three months' imprisonment would not be excessive. Anything less (including mere probation) would be insufficient.

The recommended sentence of 3 month's imprisonment and 1 year of supervised release would also serve to protect the public from further crimes by imposing on Smith an appropriate term of supervised release (or even longer probation) with appropriate terms or conditions. While supervised by a Probation Officer, Smith would be prevented from committing any similar crimes and encouraged to remain on the straight on narrow. 18 U.S.C. § 3553(a)(2)(C).

Lastly, there is no apparent need to provide Smith with educational or vocational training, medical care, or other correctional treatment that would undermine the recommended sentence. 18

23

U.S.C. § 3553(a)(2)(D). He is generally healthy. (PSR ¶¶ 80-81). He claims to have adequate training and education. (*See id.* ¶ 84). And he has maintained gainful employment. (*Id.* ¶ 84).

Therefore, the purposes of sentencing support the recommended sentence.

**4.3.    The Recommended Sentence is Generally Consistent with the Kinds of Sentences Available Under The Guidelines.**

The kinds of sentences available under the Guidelines for Smith's offenses are consistent with the recommended sentence. 18 U.S.C. § 3553(a)(3). The guideline range is 0-6 months. Because the applicable guideline range falls within Zone A of the Sentencing Table, a sentence of imprisonment is not required. USSG § 5C1.1(a). But a sentence of imprisonment is contemplated—for up to six months. Therefore, the United States' recommended sentence of three months' imprisonment falls squarely in the middle of the Guideline's recommended range.

Smith's offenses also support the kinds of sentences recommended. Smith's offenses support a term of imprisonment of up to one year. 21 U.S.C. §§ 331(a) and 333(a)(1); 18 U.S.C.§3559(a)(6). His offenses support a fine. 18 U.S.C. § 3571(b) (authorizing up to a $100,000 fine); USSG § 5E1.2(c)(3) (recommending a fine from $500 to $9,500). His offenses support a term of supervised release. 18 U.S.C. § 3583(b)(3) (authorizing up to one year of supervised release for a misdemeanor); USSG § 5D1.2(a)(3) (recommending a term of supervised release of one year for a Class A misdemeanor).[7] They also support a sentence of straight probation. 18 U.S.C. § 3561(a) and USSG § 5C1.1(a) (both authorizing probation).

Therefore, the United States' recommended sentence comports with the sentences available under the Guidelines—and falls right in the middle of the Guideline sentencing range.

---

[7] Smith's offenses are classified as Class A misdemeanors because they subject him to a term of imprisonment of up to one year. 18 U.S.C. § 3559(a)(6).

### 4.4.    The Recommended Sentence is Consistent with the Guideline Sentencing Range for Smith's Crimes.

The recommended sentence of 3 month's imprisonment, a $9,500 fine, and 1 year of supervised release is consistent with the Guidelines sentencing range of 0-6 months' imprisonment. *Supra*, Section 3; USSG § 5D1.2(a)(3) (recommending one year of supervised release for Class A misdemeanors); USSG § 5E1.2(c)(3) (recommending fine up to $9,500). Admittedly, the alternative (backup recommended) sentence of 3 years of probation would also be consistent with the Guidelines. 18 U.S.C. § 3561(a) and USSG § 5C1.1(a) (both authorizing probation).

But the United States submits that, under the circumstances, the recommended sentence, which is in the center of the Guidelines' recommended sentencing range, is appropriate.

### 4.5.    There Are No Pertinent Policy Statements Regarding Smith's Offenses.

The United States does not believe that any Guidelines Policy Statements are pertinent to this case or applicable to Smith's offenses and circumstances.

### 4.6.    The Recommended Sentence Would Not Result in Any Unwarranted Sentencing Disparities Among Similarly Situated Defendants.

The need to avoid unwarranted sentencing disparities among similarly situated defendants is not implicated in this case. 18 U.S.C. § 3553(a)(6). Among other things, the United States is recommending that Smith be sentenced to 3 months' imprisonment. The United States anticipates that Smith's counsel may argue that defendants convicted of *misdemeanor* FDCA crimes, like Smith's, such as Introducing Misbranded Drugs Into Interstate Commerce in violation of 21 U.S.C. §331(a), are often appropriately sentenced merely to probation. Therefore, Smith's counsel may

25

contend that sentencing Smith to imprisonment—even for just 3 months—would lead to an unwarranted sentencing disparity. The United States does not see it that way. For two reasons.

First, the United States contends that to the extent other sentencing courts may have imposed sentences of mere probation for misdemeanor FDCA crimes, without any prison time, such sentences may have been misguided or unjustifiably lenient. The United States Federal Food, Drug, and Cosmetic Act of 1938, 21 U.S.C. § 301 et seq. (the FDCA) was passed after an untested pharmaceutical killed scores of patients, including many children, as soon as it went on the market. *U.S. Food & Drug Administration, How Did the Federal Food, Drug, and Cosmetic Act come about?* at https://www.fda.gov/about-fda/fda-basics/how-did-federal-food-drug-and-cosmetic-act-come-about#:~:text=The%20enactment%20of%20the%201938,ability%20to%20enforce %20the%20law (last visited February 14, 2023). In response, Congress passed the FDCA to tighten controls over drugs and food, include new consumer protection against unlawful cosmetics and medical devices, and enhance the government's ability to enforce the law. *Id.* Those who flout the FDCA to market unapproved and misbranded drugs to the public pose a danger to the community and put the public's health and safety at risk. Imposing probation-only sentences for such crimes sends the wrong message to persons who do so—especially when they do it out of greed. Even if the peddled products contain physically harmless ingredients, such crimes should not be winked at. In such cases, the public may still be defrauded out of their hard-earned money by unscrupulous persons willing to take advantage of their desire to find a cure for their ailments. Even when it comes to misdemeanor FDCA misbranding violations, financial harm still matters. And probation, alone, may not be sufficient punishment. 18 U.S.C. § 3553(a) (punishment should be sufficient to further the purposes enumerated in 18 U.S.C. § 3553(a)(2)).

Second, whatever courts may have done in other misdemeanor misbranding cases, the facts in this case are particularly egregious. Smith peddled his Bx Protocol to desperately ill persons for eight years. He did it without a reasonable basis to believe his product was helping them. He watched them die while he and his wife made hundreds of thousands of dollars a year off his unapproved and misbranded miracle drug that he suggested cured everything under the sun. He did so unapologetically, without remorse, and without a conscience—ceasing to sell his ($17,000 to $28,000) Bx Protocol to the chronically ill only after the FDA began investigating him.

Any disparity that a 3-month prison sentence would create would be warranted.

### 4.7.    The Recommended Sentence Would Impose an Appropriate Fine.

Restitution is not authorized in this case. 18 U.S.C. § 3663. But the recommended sentence would impose an appropriate fine on Smith. *Cf.* 18 U.S.C. § 3553(a)(7) (generally requiring sentencing courts to consider whether restitution would be made to victims). With acceptance of responsibility, Smith's total offense level is 4. (*Supra* § 3). Under the Guidelines, the fine is calculated based on this offense level, and the appropriate fine for Smith ranges from $500 to $9,500. USSG § 5E1.2(c)(3). Smith has also agreed to pay a fine in this range. (ECF No. 9 at ¶ 12.b.). Given the egregiousness of Smith's conduct, and the amount of money he made from his crimes, the United States submits that the Court should impose the maximum $9,500 fine on Smith.

Therefore, for all the reasons stated above, the Section 3553(a) factors support the United States' recommended sentence.

### 5.  STATEMENT OF GOOD FAITH

As required by DUCrimR 32-1(b) the United States has conferred in good faith with opposing counsel and with the probation office in an attempt to resolve any disputed matters. The

United States recommends that the Court follow the United States' recommendation and impose a sentence of 3 months' imprisonment, a $9,500 fine, and 1 year of supervised release with appropriate conditions—including, especially, a condition that Smith be ordered not to market any drug or dietary supplement without prior approval from his probation officer.

DATED this 21st day of February, 2023.

TRINA A. HIGGINS
United States Attorney

*/s/ Todd C. Bouton*
TODD C. BOUTON
Assistant United States Attorney